**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FREDDIE LEE WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  13 C 8797 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| S.A. GODINEZ, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Freddie Lee Williams, an inmate in the Illinois Department of Corrections ("IDOC"), brought this action against Wexford Health Sources, Inc. ("Wexford"), certain Wexford employees, and certain IDOC employees.  Plaintiff alleges that the defendants violated his Eighth Amendment rights and are liable under 42 U.S.C. § 1983 for failing to provide adequate medical care for his stomach pain and painful subcutaneous nodules.  Defendants have moved, in two separate motions, for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons explained below, the IDOC defendants' motion is granted, and the Wexford defendants' motion is granted in part and denied in part.

## PROCEDURAL BACKGROUND

In his response to the IDOC defendants' motion, plaintiff advises the Court that he does not oppose the entry of summary judgment in favor of defendants Salvador Godinez, Marcus Hardy, Michael Lemke, Edmund Butkiewicz, Cynthia Harris, Landria Dennis, Royce Brown-Reed, and Karen Rabideau.  (ECF No. 113, Pl.'s Mem. Opp'n IDOC Defs.' Mot. at 2.)  In his response to the Wexford defendants' motion, plaintiff advises the Court that he does not oppose the entry of summary judgment in favor of LaTanya Williams, Dr. Anton Dubrick, and Dr.

Imhotep Carter. (ECF No. 117, Pl.'s Mem. Opp'n Wexford Defs.' Mot. at 2 n.2.) Accordingly, the Court will enter summary judgment in favor of these eleven defendants and against plaintiff. The remaining defendants are Anna McBee (an IDOC defendant), Dr. Saleh Obaisi (a Wexford defendant), and Wexford. The Court will refer to Obaisi and Wexford collectively as "Wexford" where appropriate.

## UNDISPUTED FACTS[1]

At the times relevant to this suit, plaintiff was an inmate at IDOC's Stateville Correctional Center ("Stateville"), and defendant McBee was employed as a counselor in Stateville's Grievance Office. (ECF No. 114, Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶¶ 1, 8.) McBee has no medical training. (ECF No. 99-3, Dep. of Anna McBee at 30.) Defendant Dr. Obaisi has been employed by Wexford as Stateville's medical director since August 2, 2012. (ECF No. 118, Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 9.)[2]

Plaintiff has been diagnosed with bipolar disorder with psychotic features. (*Id.* ¶ 3.) Since 2011, he has seen a psychiatrist or psychologist each month for a mental-health examination. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 18.) Plaintiff's medication requires regular blood tests, so he receives a blood test every six months. (*Id.* ¶ 21; Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 3.) Plaintiff has been diagnosed with high blood pressure, for which he is seen quarterly in the hypertension clinic. (Pl.'s Resp. to Wexford Defs.' LR

---

[1]The Court has not included portions of fact statements that are improperly supported or properly disputed. Furthermore, Wexford's objections to the length of plaintiff's statements of additional material facts, ECF No. 126-2, are overruled. Plaintiff's statements are not overly long, and Wexford's repetition of the objection serves only to clutter the record.

[2]IDOC contracts with Wexford to provide medical care to IDOC inmates.

56.1(a) Stmt. ¶ 4.)  At all relevant times, plaintiff knew how to request medical care at Stateville and how the grievance process operated.  (*Id.* ¶ 2.)

On October 13, 2011, plaintiff noticed stomach pain and complained to a correctional medical technician about it as well as lumps that had developed on his body; the technician examined plaintiff, documented his complaints of "hunger pains" and gas, and provided antacids.  (*Id.* ¶¶ 38-40; ECF No. 124, McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4.)  On November 2, 2011, plaintiff complained of an upset stomach to another correctional medical technician, who referred plaintiff to the nursing sick call.  (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶¶ 42, 44.)

On November 3, 2011, plaintiff filed a grievance (the "First Grievance") complaining about stomach pains and lumps (to which the parties also refer as "subcutaneous nodules" and "lipomas") forming on his body.  (ECF No. 115-3, Grp. Ex. B to Aff. of Freddie Lee Williams.)  A counselor responded on November 8, 2011 that the grievance had been forwarded to the Stateville healthcare unit for review and response.  (*Id.*)

On November 19, 2011, a nurse saw plaintiff for his complaints of heartburn and bumps that had formed on his elbow and groin.  (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 17; Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 45.)  The nurse noted that plaintiff complained about experiencing heartburn after consuming "non-commissary foods" and that she educated him about foods that would reduce acid production.  (ECF No. 105-3, Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.)  The nurse also noted that plaintiff made no complaints of pain, and she referred him to the doctor's sick call.  (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶¶ 45-46.)

On December 1, 2011, a doctor saw plaintiff, who complained about the nodules growing on his mouth, upper arm, chest, thigh, and groin.  (McBee's Resp. to Pl.'s LR 56.1(b)(3)(C)

Stmt. ¶ 6.) The doctor performed a physical examination of plaintiff, noted that the nodules were likely benign lipomas, and ordered a chest x-ray and blood tests. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 19; Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 47; McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6.) The x-ray was normal, and there were no enlarged lymph nodes in plaintiff's chest. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 48.) At the end of December 2011, plaintiff's blood was drawn. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 20.) The blood tests were normal except for one finding, about which neither side makes any substantive argument. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 49.)

On February 28, 2012, a doctor in the healthcare unit saw plaintiff, who complained of dizziness. (*Id.* ¶ 51; Pl.'s Resp. to IDOC Defs.' LR 56.1 Stmt. ¶ 23.) Plaintiff was concerned that his roommate had poisoned him. (Pl.'s Resp. to Wexford Defs.' LR 56.1 Stmt. ¶ 51.) At that time, he did not complain about his lumps or stomach pain. (Pl.'s Resp. to IDOC Defs.' LR 56.1 Stmt. ¶ 23.) The doctor noted only that plaintiff's blood pressure was high and that plaintiff should return for blood-pressure checks weekly for three weeks. Plaintiff returned for those checks on March 6, 20, and 27, 2012. (Pl.'s Resp. to Wexford Defs.' LR 56.1 Stmt. ¶ 51.)

On April 9, 2012, plaintiff had his blood drawn and was found to have high cholesterol. (*Id.* ¶ 52.) He was retested on April 26, 2012 with the same result. (*Id.* ¶ 53.) On May 18, 2012, a physician's assistant, LaTanya Williams ("PA Williams"), requested an appointment for plaintiff due to his high cholesterol. (*Id.* ¶ 54.) (It is unclear what, if anything, became of this request.)

On July 24, 2012, plaintiff submitted a grievance (the "Second Grievance") in which he complained that he was still suffering from stomach pain and pain associated with the nodules and that Stateville had failed to address his November 2011 grievance. He also stated that the

lumps were "continu[al]ly forming" and that the stomach pains seemed "to be from the soy meat which inmates receive about 4 to 5 days a week." (Grp. Ex. B to Aff. of Freddie Lee Williams.) A counselor responded on July 31, 2012, stating that after the November 2011 grievance was filed, plaintiff had been seen by a nurse in November and a doctor in December. (*Id.*)

On August 7, 2012, plaintiff's mental-health physician noted that plaintiff had reported either an increase in the size or number of his lumps and complained that he had not been seen for follow-up treatment. (Pl.'s Resp. to Wexford Defs.' LR 56.1 Stmt. ¶ 55; Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.)

On August 12, 2012, plaintiff submitted a third grievance (the "Third Grievance"), in which he asserted that although he had been seen in December 2011 after having filed the First Grievance, he got no responses to sick call slips he had submitted in March and April 2012, and he was still experiencing pain from a lump on his arm, as well as sleeplessness. (Grp. Ex. B to Aff. of Freddie Lee Williams.) A counselor responded that the grievance had been forwarded to the healthcare unit for review and response. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 28; Grp. Ex. B to Aff. of Freddie Lee Williams.)

On August 28, 2012, McBee issued a Grievance Officer's Report ("Report") denying plaintiff's First Grievance on the ground that plaintiff had been seen by a nurse in November 2011 and by a doctor in December 2011, and she recommended "[n]o action[,] as grievant received medical care." (ECF No. 115-7, Ex. 5 to Pl.'s LR 56.1(b)(3)(C) Stmt.) McBee did not talk to plaintiff about the claims he made in the First Grievance and relied solely on the response she received from the healthcare unit. (McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 26.)

On January 22, 2013, plaintiff requested to be seen by medical staff for treatment of his lumps. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 29.) About ten days later, plaintiff was

seen by a medical technician and referred to PA Williams. (*Id.* ¶ 30.) On February 15, 2013, PA Williams saw plaintiff and evaluated him for complaints of pain and numbness in his arm and elbow. (*Id.* ¶ 31; ECF No. 99-2, Pl.'s Dep. at 69.) PA Williams conducted a physical examination of plaintiff, which revealed bilateral tenderness to his elbows with no deformity, no swelling, and good strength. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 57.) She diagnosed tendinitis and prescribed Tylenol, analgesic balm, and ice therapy. (*Id.*) PA Williams filled out a healthcare unit referral slip (which does not reflect to whom it was sent) stating that plaintiff was to receive one bag of ice twice a day for one month for his elbows. (ECF No. 115-6, Ex. 4 to Pl.'s LR 56.1(b)(3)(C) Stmt.)

On March 24, 2013, plaintiff filed a fourth grievance (the "Fourth Grievance"), in which he stated that he had been seen by PA Williams for pain from a lump on his right elbow; she had stated that his "problem was due to tendinitis"; he had only received ice one time and had been informed that there was no permit for him to receive ice; there had been no follow-up care; and he was continuing to "suffer in pain." (Grp. Ex. B to Aff. of Freddie Lee Williams.) Two days later, a counselor responded that the grievance had been forwarded to the healthcare unit for review and response. (*Id.*)

On April 13, 2013, defendant McBee issued Reports denying plaintiff's Third and Fourth Grievances. In the Report denying the Third Grievance, McBee stated: "Grievance Officer finds that per Medical Records, grievant seen and treated by MD on 12/1/11. Blood work completed on 12/22/11. Medical Record does not reflect any requests for lumps since 8/2012." (ECF No. 115-8, Ex. 6 to Pl.'s LR 56.1(b)(3)(C) Stmt.) McBee believes that she did not speak with plaintiff about the Third Grievance and that she based her findings on what she was told by the healthcare unit. (McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28.) In the Report denying

the Fourth Grievance, McBee stated: "Grievance Officer finds that per Medical Records, grievant was seen and treated by PA Williams on 2/15/13 as stated in his grievance. There are no notes in chart by grievant indicating he is still having issues." (ECF No. 115-9, Ex. 7 to Pl.'s LR 56.1(b)(3)(C) Stmt.)  In both Reports, McBee recommended "[n]o action[,] as grievant appears to be receiving appropriate medical care at this time." (*Id.*; Ex. 6 to Pl.'s LR 56.1(b)(3)(C) Stmt.)

In May 2013, plaintiff received a letter from IDOC Medical Director Dr. Louis Shicker stating that there were no records of any medical requests received by the healthcare unit for plaintiff since February 2013. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 40.)  Plaintiff asserts that he did make such requests in sick call slips. (ECF Nos. 115-1 & 115-2, Aff. of Freddie Lee Williams ¶ 12 & Ex. A.)

On June 7, 2013, plaintiff filed a fifth grievance (the "Fifth Grievance") in which he reiterated that he had been complaining about his lumps since late 2011, referred to his prior grievances, complained that his nodules had increased in size and number, and asked for a referral to a specialist as well as for imaging tests. (Grp. Ex. B to Aff. of Freddie Lee Williams.) On June 12, 2013, a counselor responded that the grievance had been forwarded to the healthcare unit for review and response. (*Id.*)

On August 12, 2013, plaintiff was seen by medical staff on sick call in connection with his subcutaneous nodules, and he was referred to "MD sick call." (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 38; McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 10.)  The nurse noted that plaintiff had nodules on his right and left upper arms, groin, and lower back and that some were sensitive to touch. (McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 10, ECF No. 126-2, Wexford Defs.' Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 10.)

On September 19, 2013, plaintiff was seen by a doctor in the healthcare unit for his sore lumps. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 40; Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 60.) Plaintiff also complained about throbbing headaches. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 60; McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 11.) The doctor noted that plaintiff reported that he first had lumps in November 2011, had had an x-ray and blood tests, the lumps started to bother him again in 2013, new ones had started forming in May 2013, and the lumps on his right arm and groin were sore. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 60; Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.) The doctor examined plaintiff and noted that the lumps were rubbery and one on his right arm was tender. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 60; Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.) The doctor diagnosed the lumps as lipomas and concluded that the likely cause of plaintiff's headaches was his elevated blood pressure. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 60; Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.) The doctor reassured plaintiff and ordered blood tests and a follow-up appointment in six weeks. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 60.) It is undisputed that there is no connection between plaintiff's hypertension and the lipomas. (*Id.* ¶ 61.)

On September 27, 2013, McBee issued a Report denying the Fifth Grievance and stating that according to the administrator of the healthcare unit, plaintiff was seen on RN Sick Call on August 12, 2013, referred to MD Sick Call, and evaluated by Dr. Davis on September 19, 2013, who had ordered weekly blood-pressure tests for four weeks and laboratory tests and had scheduled an October follow-up appointment. (ECF No. 115-10, Ex. 8 to Pl.'s LR 56.1(b)(3)(C) Stmt.) McBee recommended "[n]o action[,] as grievant appears to be receiving appropriate medical care at this time." (*Id.*) McBee's evaluation of the Fifth Grievance was based solely on

her communication with the healthcare unit. (McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 29.) Also on September 27, 2013, a correctional medical technician received a letter from plaintiff complaining of multiple issues and scheduled plaintiff for a sick call visit on October 4, 2013. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 62.)

On October 4, 2013, plaintiff was seen by a nurse for elevated blood pressure and fatty tissue under each arm without complaints of current pain. (*Id.* ¶ 63.) The nurse referred plaintiff to the hypertension clinic and scheduled him for a sick call visit on October 21, 2013. (*Id.*) It is unclear if plaintiff was seen on that day.

On December 9, 2013, plaintiff filed the original complaint in this action.

On December 10, 2013, plaintiff saw the same doctor he had seen in September 2013, and he complained of pain in his arm, elbow, and left flank. (*Id.* ¶ 64; Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.) Examination revealed that plaintiff's right wrist was tender and swollen with a limited range of motion. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 64.) Plaintiff was given Naproxen, which is a non-steroidal anti-inflammatory agent that reduces inflammation and pain in a muscle, tendon, or other soft tissues of the body. (Pl.'s Resp. to Wexford Defs.' LR 56.1 Stmt. ¶¶ 37, 64; Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.) Plaintiff's right wrist and elbow were x-rayed, and the x-ray results were negative. (Pl.'s Resp. to Wexford Defs.' LR 56.1 Stmt. ¶ 64; Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.) Follow-up was scheduled for January 7, 2014. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 64.)

On January 10, 2014, plaintiff saw a doctor and complained that his elbow still hurt and the medication he had been given "did nothing." (Grp. Ex. C to Wexford Defs.' LR 56.1(a) Stmt.) Examination revealed a palpable tender nodule on plaintiff's right elbow, and he was

given another type of pain medication and referred to the medical director, Dr. Obaisi. (*Id.*; Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 65.)

On February 6, 2014, Dr. Obaisi examined plaintiff and determined that plaintiff had nine small subcutaneous benign lipomas on his right elbow, left arm, thigh, and chest. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 42; Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 66.) Obaisi told plaintiff that the lumps were called lipomas and assured him they were benign. (ECF No. 99-4, Dep. of Dr. Saleh Obaisi at 120.) He also prescribed Naproxen and advised plaintiff to lose weight. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 42; Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 66.)

On February 18, 2014, plaintiff submitted a sixth grievance (the "Sixth Grievance") complaining about his visit with Dr. Obaisi. (Grp. Ex. B to Aff. of Freddie Lee Williams.) Plaintiff stated that his lumps were an ongoing medical problem and complained that Obaisi had not ordered a CT scan, MRI, ultrasound, or biopsy. (*Id.*) He also stated that he was still in pain and the Naproxen was not helping. (*Id.*)

On March 7, 2014, plaintiff filed the First Amended Complaint, the current complaint in this action.

On June 2, 2014, McBee issued a Report denying the Sixth Grievance, stating that according to one of the registered nurses, a review of plaintiff's chart showed that he had been seen by Dr. Obaisi on February 6, 2014; pain medication had been prescribed and given to plaintiff; the doctor had not requested a follow-up; plaintiff had not requested a follow-up evaluation; and plaintiff had been seen in the healthcare unit for a different issue on February 8, February 15, February 22, and March 1 without his mentioning continuing pain or requested treatment. (ECF No. 115-11, Ex. 9 to Pl.'s LR 56.1(b)(3)(C) Stmt.) McBee noted that plaintiff

could submit a medical request slip if he wished to be re-evaluated, and she recommended "[n]o action[,] as grievant appears to be receiving appropriate medical care at this time." (*Id.*) McBee cannot recall whether she did any investigation of the Sixth Grievance other than checking with the healthcare unit. (McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 30.)

On October 30, 2014, plaintiff complained in a seventh grievance (the "Seventh Grievance") about the subcutaneous nodules, the associated pain, and the healthcare unit's failure to provide him pain relief. (Grp. Ex. B to Aff. of Freddie Lee Williams.) The Seventh Grievance was denied (not by McBee) in December 2014, but the denial included a statement that plaintiff would be scheduled to see a medical care provider on the next available date. (ECF No. 115-12, Ex. 10 to Pl.'s LR 56.1(b)(3)(C) Stmt.)

On March 25, 2015, PA Williams saw plaintiff for his annual physical. When plaintiff complained about a painful nodule in his groin and a nodule on his right elbow that was making his arm numb, PA Williams diagnosed him with multiple lipomas and referred him to Obaisi. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 68; McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt.¶ 16; Wexford Defs.' Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 15.)

On April 2, 2015, Obaisi examined plaintiff, who complained that he had had a painful mass in his left groin for two years, and Obaisi determined that plaintiff had a large lipoma there. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 69; Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 49.) Obaisi referred the matter to collegial review for outside surgical consultation. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 69.) Thereafter, Wexford approved plaintiff to be seen by an outside provider at the University of Illinois at Chicago Hospital ("UIC") for a general surgery consultation. (*Id.*; Pl.'s Resp. IDOC Defs.' LR 56.1(a) Stmt. ¶ 49; Obaisi Dep. at 125.)

On June 1, 2015, plaintiff filed an eighth grievance regarding the subcutaneous nodules and related pain and the failure of the healthcare unit to ensure that he was seen at UIC for treatment. (Grp. Ex. B to Aff. of Freddie Lee Williams.)

In early October 2015, plaintiff was again seen by a doctor at Stateville, who indicated that she would evaluate plaintiff's subcutaneous nodules by inserting a needle into one and drawing fluid. (McBee's Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19.) Since that time, however, medical staff has not followed up. (*Id.*) Although plaintiff was approved to see a specialist in April 2015, as of November 2015 he had yet to be seen by a specialist, and his subcutaneous nodules remained painful. (*Id.* ¶ 18.) When Obaisi was deposed in July 2015, he did not know when or whether UIC would schedule plaintiff for an appointment. (Obaisi Dep. at 125.) His policy is to contact UIC after ninety days if the hospital has not scheduled an appointment for a referred inmate. (*Id.* at 127-28.)

Dr. Obaisi testified at his deposition as follows. Plaintiff has multiple subcutaneous lipomas and is obese. (Pl.'s Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 46.) Obaisi has treated patients with subcutaneous nodules hundreds of times in his career as a physician. (Pl.'s Resp. to Wexford Defs.' LR 56.1(a) Stmt. ¶ 23.) The diagnostic protocol for a patient with subcutaneous nodules is to take a medical history and perform a clinical examination to determine whether the lumps are benign. (*Id*. ¶¶ 24, 32.) The physician considers the consistency of the lump; its size; its shape; and whether it is soft, hard, or rubbery. (*Id.* ¶ 25.) With a lipoma, which is a benign, fatty lump, the lump will be soft, round, and mobile, and usually there will be more than one. (*Id.* ¶¶ 26, 31.) A lipoma can become larger on its own for no apparent reason. (*Id.* ¶ 35.) There is no specific treatment generally recommended for subcutaneous lipomas, and the only way to get rid of them is to surgically excise them. (Pl.'s

Resp. to IDOC Defs.' LR 56.1(a) Stmt. ¶ 47.)  Excision is not routinely performed; it is done only in "complicated cases"; when a lipoma becomes very large or begins growing quickly; when cancer is suspected; or when the lipoma causes pressure or pain.  (Obaisi Dep. at 78, 86, 124.)  Lipomas are not routinely biopsied, nor are they imaged unless cancer is suspected.  (Pl.'s Resp. to Wexford Defs.' LR 56.1 Stmt. ¶¶ 29-30.)  Blood tests are not necessary when assessing a possible lipoma.  (*Id.* ¶ 33.)

According to plaintiff, he has developed subcutaneous nodules on both sides of his ribs, the front of his elbows, the outside surface of his stomach, and his groin.  (Aff. of Freddie Lee Williams ¶ 4.)  All of the nodules have grown since 2011, and the one on his groin has grown considerably larger.  (*Id.* ¶ 5.)  The nodules have been continually painful, and plaintiff experiences "sharp, throbbing" pain from the one on his groin; the pain increases when clothing brushes against it.  (*Id.* ¶ 6.)  The pain from plaintiff's nodules often prevents him from writing or cleaning his clothes, and he is often awakened by the pain if he rolls over when sleeping and puts pressure on them.  (*Id.*)  The painful nodules have been a "constant issue" since 2011; medical staff at Stateville has failed to provide any treatment that has alleviated plaintiff's pain, and he has repeatedly so notified them.  (*Id.* ¶¶ 6-8.)

## DISCUSSION

### A.    Events Occurring After the Filing of the Amended Complaint

As an initial matter, the Court must address the fact that plaintiff's arguments against the remaining defendants rely in part on events that occurred after the filing of the operative complaint on March 7, 2014.  Wexford contends, in its reply brief, that the Court "should not even consider the facts related to any care and treatment past March 7, 2014 as it is not relevant to the case at hand."  (ECF No. 126-1, Wexford Defs.' Reply at 6.)  "Normally, a complaint can

seek relief only for events that have already occurred. . . . Before the complaint may be broadened to encompass subsequent events, the plaintiff must move to supplement it." *Chi. Reg'l Council of Carpenters v. Vill. of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011). The court has "substantial discretion" to permit or deny such a motion. *Id.* Although plaintiff has not formally moved to supplement the amended complaint with the events he sets out in his Local Rule 56.1 Statement of Additional Facts, the Court construes his Statement as such a motion, in the interest of judicial economy, and grants the motion. The events that occurred after the filing of the amended complaint are part of what plaintiff says is a multi-year course of deliberate indifference to his painful lipomas. Judicial economy would not be served by disregarding what happened (and what did not happen) at Stateville after the filing of the amended complaint. The court is not persuaded by Wexford's argument that it would be "severely prejudicial" for it to defend against "brand new allegations" that were not the subject of discovery.[3] Wexford does not describe with any particularity what additional discovery it needs to respond to plaintiff's arguments, and anything that it would need is in its own possession. The Court will consider plaintiff's amended complaint to encompass the events described in his Statement that occurred prior to briefing of the instant summary judgment motions.

**B.** **Legal Standards**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and all inferences that reasonably can be

---

[3]Accordingly, Wexford's relevancy objections in its response to plaintiff's Statement are overruled.

drawn therefrom in the light most favorable to the nonmoving party. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 499-500 (7th Cir. 2008). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted). When the nonmovant has the burden of proof, the moving party can satisfy its burden on summary judgment by "pointing out to the district court" that there is no evidence supporting the nonmovant's claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrowski*, 712 F.3d at 1168 (quoting *Celotex*, 477 U.S. at 322).

The individual defendants violated plaintiff's Eighth Amendment rights only if they were deliberately indifferent to his objectively serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, --- F.3d ----, 2016 WL 4631679, at *2 (7th Cir. Aug. 25, 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

## C.    Objectively Serious Medical Condition

An objectively serious medical condition is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)

(quoting *Zentmyer v. Kendall Cty.*, 220 F.3d 805, 810 (7th Cir. 2000)).  Defendants contend that plaintiff cannot demonstrate that he had an objectively serious medical condition.

Plaintiff asserts that in 2011, he "began to develop subcutaneous nodules inside his abdomen, which became associated with significant stomach pain."  (Pl.'s Mems. Opp'n Defs.' Mots. at 1; *see also* Aff. of Freddie Lee Williams ¶ 3.)  The assertions that plaintiff had nodules "inside his abdomen" and that they were associated with his stomach pain are entirely speculative and have no competent support in the record.  Accordingly, the Court will treat the stomach pain and the lipomas as two separate medical conditions.[4]

As for the stomach pain, plaintiff's complaints about it ended in 2012 without further treatment, and all indications in the record are that it was associated with plaintiff's diet.  There is no evidence that the pain was severe or chronic, worsened over time, or caused attendant symptoms such as vomiting.  Accordingly, plaintiff's stomach pain was not an objectively serious medical condition.  *See Riley El v. Godinez*, No. 13 C 5768, 2016 WL 4505038, at *11 (N.D. Ill. Aug. 29, 2016) ("Stomach pain with no attendant symptoms other than diarrhea, which resulted from drinking discolored and foul-smelling water on one occasion, is not an objectively serious medical condition."); *Perez v. Hardy*, No. 13 C 5635, 2015 WL 5081355, at *7 (N.D. Ill. Aug. 27, 2015) (citing cases).

Plaintiff's painful lipomas are another matter.  McBee contends that plaintiff cannot establish that they were a serious medical condition because he "has no evidence outside of his assertions of pain and discomfort."  (ECF No. 100, IDOC Defs.' Mem. Supp. Mot. at 4.)  In

---

[4]Wexford moves to strike plaintiff's affidavit to the extent that plaintiff attempts without medical evidence to link his complaints of stomach pain and the subcutaneous nodules.  (Wexford Defs.' Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1.)  The motion is denied as moot because the Court will not rely on plaintiff's unsupported assertion.

support of this argument, McBee cites *Martinez v. Hedrick*, 36 F. App'x 209 (7th Cir. 2002), and *Kendrick v. Frank*, 310 F. App'x 34 (7th Cir. 2009). In *Martinez*, the Court concluded that plaintiff had submitted no evidence that a single lipoma on his back was a serious medical need where plaintiff had complained only that it was tender when touched and that he could not sleep on his left side, and doctors considered removal to be an elective procedure. 36 F. App'x at 211. In *Kendrick*, the Court concluded that there was no evidence that plaintiff suffered from a serious medical condition where he had a lipoma on his shoulder but did not complain of tenderness or pain. 310 F. App'x at 36-38. Wexford presents a similar argument that benign lipomas do not amount to an objectively serious medical condition. (ECF No. 103, Wexford Defs.' Mem. Supp. Mot. at 4-9.) In addition to *Martinez* and *Kendrick*, Wexford cites *Flores v. Welborn*, 119 F. App'x 6 (7th Cir. 2004), and *Thompson v. Godinez*, 561 F. App'x 515 (7th Cir. 2014). Although the plaintiff in *Flores* had occasionally complained that his lipoma was painful, his principal allegation was that his lipoma should have been removed because it was growing and interfering with muscle function. Because plaintiff did not offer evidence that the defendants acted with deliberate indifference, neither the district court nor the Court of Appeals addressed the issue of whether plaintiff had an objectively serious medical condition. In *Thompson*, the plaintiff had a lipoma on his forehead and did not complain of any associated pain.

The decisions defendants cite are distinguishable and do not stand for the proposition that lipomas can never constitute a serious medical need. None of them involved what the record shows was reported to the medical staff at Stateville—multiple lipomas with associated pain that went on for several years, led to sleeplessness, and interfered with daily activities. There is sufficient evidence in the record that the pain associated with plaintiff's lipomas was chronic and

thus that it was an objectively serious medical condition. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (chronic pain); *Dismukes v. Baker*, No. 11-CV-3345, 2013 WL 28770, at *5 (C.D. Ill. Jan. 2, 2013) (denying defendant doctor's motion for summary judgment where plaintiff complained of excruciating pain when lying on a large lipoma on his head); *see also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) ("[T]here is no requirement that a prisoner provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition.").

**D.     Deliberate Indifference**

Defendants also contend that plaintiff cannot demonstrate that they were deliberately indifferent to plaintiff's medical needs. "Claims of deliberate indifference to medical needs are examined differently depending on whether the defendants in question are medical professionals or lay persons." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

**1.     Anna McBee**

Lay persons like McBee who are not responsible for administering medical care to prisoners are entitled to defer to the judgment of jail health professionals as long as they do not ignore the prisoner. *See King*, 680 F.3d at 1018 (citing *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). "The only exception to this rule is that nonmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Id.* (quoting *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008)).

The claims against McBee are based solely on her denials of plaintiff's First, Third, Fourth, Fifth, and Sixth Grievances. McBee contends that she is entitled to summary judgment because the grievances were forwarded to the healthcare unit, plaintiff was seen by medical staff,

and she consulted plaintiff's medical records and/or healthcare unit staff to determine that plaintiff had received medical care after filing each grievance. In response, plaintiff argues that McBee "turn[ed] over her duties regarding medical grievances" to the healthcare unit and "allow[ed]" the healthcare unit to "write the responses." (Pl.'s Mem. Opp'n IDOC Defs.' Mot. at 14.)

Plaintiff mischaracterizes the evidence. The record does not show that McBee delegated her duties to anyone or allowed anyone else to write her responses. Rather, the record shows that McBee consulted the healthcare unit and plaintiff's medical records to determine whether he had been treated by medical staff in the period between the filing of each grievance and the issuance of McBee's corresponding report. McBee reviewed each of plaintiff's grievances and verified that he was receiving medical treatment in the healthcare unit (on a fairly regular basis, at that). There is no evidence that McBee had reason to believe that the medical staff was mistreating plaintiff, and she did not ignore plaintiff's complaints or prevent him from receiving medical care. Accordingly, her conduct cannot be viewed as deliberate indifference. *See Greeno*, 414 F.3d at 656 ("If a prisoner is under the care of medical experts[,] a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.") (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *Phillips v. Wexford Health Sources, Inc.*, 522 F. App'x 364, 367 (7th Cir. 2013) ("We do not hold grievance officers liable for doing their job of investigating and resolving grievances.") (citing *Burks v. Raemisch*, 555 F.3d 592, 595-96 (7th Cir. 2009)). Plaintiff contends that McBee's failure to address his problem receiving ice (in the Fourth Grievance) "did not involve deference to the [healthcare unit], but rather her own erroneous belief" that a physician's assistant had not given plaintiff an ice permit. (Pl.'s Mem. Opp'n IDOC Defs.' Mot. at 14.) But plaintiff cites no authority for the proposition

19

that such a mistake rises to the level of deliberate indifference or that plaintiff's failure to receive ice was a substantial deprivation. On this record, a reasonable factfinder could not find that McBee was deliberately indifferent to a substantial risk of harm to plaintiff. Accordingly, the Court grants McBee's motion for summary judgment. In light of this ruling, the Court need not address McBee's argument regarding qualified immunity.

## 2. Dr. Obaisi

A medical professional acted with deliberate indifference if he "was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to his health." *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002) (internal quotation marks and citation omitted). "Negligence or even gross negligence does not constitute deliberate indifference." *Id.*; *see also Greeno*, 414 F.3d at 653 ("[N]either medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference . . . ."). The Seventh Circuit has identified "several circumstances that can be enough to show deliberate indifference," *Petties*, 2016 WL 4631679, at *3, two of which plaintiff relies upon. "[W]e look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.*

Dr. Obaisi first saw plaintiff on February 6, 2014, after plaintiff had complained of pain from a nodule on his right elbow. He examined plaintiff, determined that plaintiff had benign lipomas, and prescribed anti-inflammatory pain medication. Obaisi saw plaintiff again on April 2, 2015, after plaintiff complained about a painful nodule in his left groin. Obaisi determined that plaintiff had a large lipoma there and referred the matter to collegial review for an outside surgical consultation, which was approved. Obaisi maintains that "[t]his pattern of care does not approach the level of deliberate indifference required to sustain a Section 1983 claim such as

Plaintiff's." (Wexford Defs.' Mem. Supp. Mot. at 13.) Plaintiff responds that Obaisi was deliberately indifferent to his painful nodules in two ways. The first is by persisting in a course of treatment known to be ineffective; in February 2014, Obaisi prescribed Naproxen for pain, which had previously been prescribed but, "according to the January 10, 2014 medical notes," was not helping. (Pl.'s Mem. Opp'n Wexford Defs.' Mot. at 10-11.) It was not until April 2015, after another year of plaintiff experiencing painful nodules, that Obaisi referred plaintiff to an outside surgeon for a consultation. According to plaintiff, Obaisi should have addressed his unresolved pain in 2014 by referring him, at that point, to a surgical specialist. And although Obaisi obtained approval in April 2015 for plaintiff to see an outside specialist, plaintiff still had not seen a specialist by November 2015.[5] This inexplicable delay is the second way in which plaintiff asserts Obaisi was deliberately indifferent to his pain.

The thrust of Obaisi's argument is that because he saw plaintiff and treated him, and then later secured approval for a referral to an outside specialist, a jury could not find that he was deliberately indifferent to plaintiff's medical condition. But the fact that plaintiff received some medical treatment from Obaisi does not necessarily defeat plaintiff's claim. *See Petties*, 2016 WL 4631679, at *4; *LaBoy v. Ghosh*, No. 11 C 3950, 2011 WL 6140855, at *4 (N.D. Ill. Dec. 9, 2011). Plaintiff's medical records show that prior to his first visit with Dr. Obaisi, plaintiff had been complaining to the healthcare unit about painful nodules on his right arm and groin for at least six months, had complained in grievances about a painful nodule on his right arm as early as March 2012, and had also complained that pain medication was not helping. In reply, Obaisi argues that while it is true that plaintiff had previously been prescribed Naproxen, it was not for

---

[5]The Court does not know whether plaintiff has yet seen a specialist.

his painful nodules but for "arm pain and flank pain," and medication can work differently for different types of pain. (Wexford Defs.' Reply at 11.)

When plaintiff's medical records are read as a whole along with his grievances and in the light most favorable to plaintiff, it can be inferred that plaintiff had been prescribed Naproxen after having complained about arm pain stemming from the nodule on his right elbow. Obaisi stated during his deposition that he thought that he had probably reviewed plaintiff's medical records prior to examining plaintiff in February 2014. (Obaisi Dep. at 121.) He also acknowledged that although the excision of benign lipomas is not routinely performed, it is done when a lipoma causes pressure or pain. Yet Obaisi has not offered any medical justification for again prescribing Naproxen, and forgoing excision or a referral for possible excision, *in light of* plaintiff's long-standing complaints of unresolved pain. The record does not reveal the reasons for Obaisi's treatment choices. The record also does not reveal why Obaisi did not follow his own stated policy of contacting UIC after ninety days if the hospital has not scheduled an appointment for a referred inmate. Accordingly, Obaisi has failed to satisfy his burden on summary judgment, so the Court denies his motion. *See Smego v. Mitchell*, 723 F.3d 752, 757 (7th Cir. 2013) (holding that fact issues precluded summary judgment in favor of dentist where, although some of her alleged conduct, "standing alone, could be regarded simply as negligence . . . a reasonable jury could look at this pattern and infer deliberate indifference, particularly because [the dentist] offered no medical justification for the long delays in treatment or her refusal to prescribe appropriate pain medication."); *Wilder v. Wexford Health Sources, Inc.*, No. 11 C 4109, 2015 WL 2208440, at *8 (N.D. Ill. May 8, 2015) (holding that a reasonable jury could find that the defendant physician's delay in treating a long-standing painful problem was

deliberate indifference where the physician himself acknowledged that surgery should be performed if constant pain was present).

### 3. Wexford

Wexford can be held liable for Dr. Obaisi's conduct only if it represents Wexford's own policy. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Plaintiff alleges that Wexford is liable due to its "formal or informal . . . policies and/or guidelines designed to delay and minimize the medical treatment provided to Stateville inmates in order to increase Wexford's profitability." (ECF No. 15, First Am. Compl. ¶ 48.) Wexford contends that it is entitled to summary judgment because plaintiff does not have evidence of any such policy.

In response, plaintiff argues that the Court can take judicial notice of the report of a court-appointed expert in another case pending before this Court, *Lippert v. Godinez*, 10 C 4603, regarding the deficiencies in IDOC and Wexford's provision of medical care (the "Lippert Report"). (Pl.'s Mem. Opp'n Wexford Defs.' Mot. at 12-13.) According to plaintiff, the Lippert Report states that "there routinely were significant delays in inmates obtaining appointments at UIC" and "echoed" a previous report issued by the John Howard Association of Illinois, which concluded that "a lack of adequate staffing and resources was resulting in delayed diagnosis, treatment and medical error." (*Id.*) Plaintiff submits that therefore, a fact issue exists regarding whether Wexford "has been aware that Stateville" is understaffed and "not adequately referring inmates needing specialized care." (*Id.* at 13.)

Assuming, without deciding, that the Lippert and John Howard reports are admissible for the truth of their substance, the Court is unpersuaded by plaintiff's attempt to create a genuine issue of material fact as to Wexford's liability by relying on the reports. It is unclear what "concrete policy, let alone an unconstitutional one," *Olive v. Wexford Corp.*, 494 F. App'x 671,

673 (7th Cir. 2012), plaintiff is identifying. Plaintiff does not submit evidence of any policy *designed to* delay treatment or minimize costs, as he alleges; his most specific argument is that Stateville is understaffed. Assuming that the reports in fact describe systemic staffing failures at Stateville, though, plaintiff fails to connect such a finding to the facts of this case. There is no evidence that staffing issues or a lack of resources had anything to do with what plaintiff says were the constitutional deficiencies in Obaisi's provision of medical care. Because plaintiff has failed to offer evidence that Wexford has policies that caused his harm, Wexford is granted summary judgment.

## CONCLUSION

The IDOC defendants' motion [98] is granted. Judgment will be entered against plaintiff and in favor of defendants Anna McBee, Salvador Godinez, Marcus Hardy, Michael Lemke, Edmund Butkiewicz, Cynthia Harris, Landria Dennis, Royce Brown-Reed, and Karen Rabideau.

The Wexford defendants' motion [102] is granted in part and denied in part. The motion is denied as to Dr. Saleh Obaisi, but granted as to defendants LaTanya Williams, Dr. Anton Dubrick, Dr. Imhotep Carter, and Wexford Health Sources, Inc. Judgment will be entered against plaintiff and in favor of defendants LaTanya Williams, Dr. Anton Dubrick, Dr. Imhotep Carter, and Wexford Health Sources, Inc.

The sole remaining claim in this case is plaintiff's deliberate indifference claim against Dr. Saleh Obaisi. A status hearing is set for September 29, 2016, at 9:30 a.m. to discuss the next steps in the case.

**SO ORDERED.**                    **ENTERED:   September 16, 2016**

_____
**JORGE L. ALONSO**
**United States District Judge**